# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 20-38 consolidated with 20-122


**EDITH LORRAINE HAGER**

**VERSUS**

**HOSPITAL HOUSEKEEPING SYSTEM, L.L.C.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT # 2
PARISH OF RAPIDES, NO. 18-07756 AND 19-08271
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

## CANDYCE G. PERRET
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Candyce G. Perret and
Jonathan W. Perry, Judges.


**APPEAL AFFIRMED;**
**WRIT GRANTED.**

**George A. Flournoy**
**Flournoy Law Firm**
**1239 Jackson Street**
**Alexandria, LA   71301**
**(318) 487-9858**
**COUNSEL FOR PLAINTIFF/APPELLANT/APPLICANT:**
    **Edith Lorraine Hager**

**Ryan G. Davis**
**Talley, Anthony, Hughes and Knight**
**2250 7th Street**
**Mandeville, LA   70471**
**(985) 624-5010**
**COUNSEL FOR DEFENDANT/APPELLANT/RESPONDENT:**
    **Hospital Housekeeping Systems, L.L.C.**

**PERRET, Judge.**

Plaintiff, Edith Hager, appeals an August 22, 2019 judgment from the Office of Workers' Compensation, alleging that the workers' compensation judge ("WCJ") erred in terminating her supplemental earnings benefits ("SEBs") on May 16, 2019, and in denying her claim for sanctions due to defendant's, Hospital Housekeeping Systems, L.L.C. ("HHS"), failure to authorize necessary medical treatment. HHS answered the appeal alleging that the WCJ erred in awarding Ms. Hager penalties and attorney fees upon finding that it was arbitrary and capricious in terminating her temporary total disability ("TTD") benefits in October 2018.

While the appeal was pending, Ms. Hager filed a writ with this court seeking review of the WCJ's January 27, 2020 ruling, which granted HHS's motion to compel Ms. Hager to submit to a functional capacity examination ("FCE").[1] Because the judgment compelling Ms. Hager to submit to an FCE arises out of the same work-related accident and involves the shoulder injury that is at issue in the pending appeal, this court granted the writ application for the limited purpose of ordering the consolidation of the writ application with this appeal.

For the following reasons, we hereby affirm the WCJ's August 22, 2019 judgment that awarded Ms. Hager SEBs from October 18, 2018 through May 16, 2019, and ordered HHS to pay penalties and attorney fees for its arbitrary and capricious termination of indemnity benefits. Additionally, we hereby grant Ms. Hager's writ application and reverse the WCJ's January 27, 2020 interlocutory judgment that granted HHS's Motion to Compel Functional Capacity Examination.

---

[1] Although the WCJ signed a judgment ordering Ms. Hager to submit for an FCE, he stayed that order pending this court's ruling on the writ application.

**FACTS AND PROCEDURAL HISTORY:**

On July 20, 2017, Ms. Hager suffered a right shoulder injury while in the course and scope of her employment with HHS, a company that provides cleaning services to Christus St. Frances Cabrini Hospital ("Cabrini Hospital") in Alexandria, Louisiana. Specifically, Ms. Hager was pulling a large and heavy trash bag out of a dialysis trash can and strained her shoulder. She immediately reported the accident and was taken to the emergency room.

On July 21, 2017, Ms. Hager visited Premier Urgent Care, where she began treatment with Dr. Robert Harvey. Dr. Harvey restricted Ms. Hager from lifting anything greater than ten pounds over her shoulder and from strong gripping and repetitive motion with her right hand. His treatment plan included pain medication and physical therapy. Subsequently, Dr. Harvey ordered Ms. Hager to undergo magnetic resonance imaging ("MRI"), which revealed a right shoulder rotator cuff tear. He then referred Ms. Hager to Dr. Michael Brunet, an orthopedic specialist.

Dr. Brunet started treating Ms. Hager on October 19, 2017, and diagnosed her with "calcific tendinitis of right shoulder, strain of muscle fascia and tendon along head of biceps, [of] right arm[.]" On November 14, 2017, Dr. Brunet performed a right shoulder arthroscopy. On November 29, 2017, and December 28, 2017, Dr. Brunet requested physical therapy for Ms. Hager; however, it is undisputed that Dr. Brunet's office never forwarded to CorVel, the third-party administrator for HHS, a 1010 Request for Authorization for any therapy after the November 14, 2017 surgery.

On March 27, 2018, Dr. Brunet performed a closed right shoulder manipulation, a procedure to improve Ms. Hager's stiffness and range of motion. After this second surgery, Dr. Brunet submitted a 1010 Request for Authorization

for physical therapy, which HHS authorized. Ms. Hager attended the physical therapy sessions from March 28, 2018 through May 23, 2018.

In August 2018, Ms. Hager moved from Alexandria, Louisiana to Virginia. On October 11, 2018, Ms. Hager was seen by Dr. Brunet for a follow-up treatment, which was the first time he had seen her since May 17, 2018. In his medical notes from that day, Dr. Brunet stated that Ms. Hager "has relocated to the Virginia area" and that she should seek "long-term pain management but [that] this would have to be done through the offices of her family physician in the Virginia area." Dr. Brunet further stated that, in his opinion, she has not reached "maximum medical improvement as of yet and can be employed only in a sedentary fashion."

On October 17, 2018, HHS offered Ms. Hager a sedentary position at Cabrini Hospital at the same rate of pay and same hours as she had pre-accident. This job offer provided Ms. Hager the following position responsibilities:

- Report to EVS Director for Restricted/Light Duty assignment schedule.

- Make copies of daily packets.

- Fold rags and mops.

- Create washcloth origami . . . for EVS housekeepers to place in rooms.

- Wipe off and clean all EVS pagers, phones, keys and key fobs, which weigh less than 5 lbs[.]

- Wipe off all empty chemical bottles and ensure proper labels are posted on them[.]

- Count and log inventory, within EVS storeroom, for paper products.

- Office [s]upply inventory[.]

- Roll silverware[.]

- Unacceptable work:

3

- Cleaning of any sort.

- Patient rounding or patient advocate work.

- Administrative Assistant-like Duties: For example, answering telephone, filing sensitive documents, etc.

However, Ms. Hager testified at trial that she never received notice of this offer because she had moved to Virginia. HHS terminated Ms. Hager's TTD benefits on October 17, 2018.

On November 15, 2018, Kayla Breaux, the medical case manager with CorVel, met with Dr. Brunet to review Ms. Hager's work injury management plan. Dr. Brunet's notes reflect that Ms. Hager could return to sedentary work and, assuming a repeat MRI was clear, recommended the following work restrictions to his release work form: (1) no lifting over ten pounds, (2) no work with her right arm, (3) and no over the shoulder work. On November 21, 2018, in response to Dr. Brunet's November 15th notes that Ms. Hager could return to sedentary work within these restrictions, HHS made another offer of employment for Ms. Hager. The offer of employment also consisted of having Ms. Hager work at Cabrini Hospital at the same pay and hours as she had pre-injury, and provided the following position requirements: "No work using right arm[,] No lifting over 10 lbs.[,] No over shoulder work/bending/stooping[,] and Seated duties only allowing for position change as needed to relieve discomfort[.]"

It is undisputed that HHS paid Ms. Hager weekly indemnity benefits in the amount of $306.67 from November 13, 2017 through October 17, 2018, and that it paid all of her medical expenses. Nonetheless, on November 16, 2018, Ms. Hager filed a Form 1008 Disputed Claim for Compensation alleging the following: "Non-payment or incorrect or untimely payments of TTD benefits and/or SEB[;]" "Penalties and attorney's fees . . .[;]" "Legal interest on all awards from

4

appropriate date[;]" and "Court costs[.]" On April 26, 2019, Ms. Hager filed a Motion and Order to File Amending 1008 seeking to add the following allegations to the original Disputed Claim for Compensation: "Extent and duration of disability and entitlement to indemnity benefits[;]" "Failure to furnish and/or provide authorization for proper medical treatment[;]" "Non-payment and/or untimely payment of medical and travel related expenses[;]" "Discontinuance of benefits[.]" However, on April 30, 2019, the WCJ denied Ms. Hager's amending 1008 petition as untimely because it was filed beyond the schedule conference order allowing for the filing of any amendments to pleadings.

Before beginning the one-day bench trial, the WCJ reiterated to the parties that he previously denied the 1008 amending petition and that the only issues before the court were: (1) whether Ms. Hager is entitled to TTD or SEBs; whether it was proper for HHS to terminate Ms. Hager's TTD benefits in October 2018; and (3) whether Ms. Hager is entitled to penalties and attorney fees. It is worth noting that before trial, Ms. Hager's counsel specifically stated that "the only issue, really, of penalties and attorney's fees, concerns the termination of benefits" and that he did not think he could "make a penalties and attorney's fee claim for the failure to authorize physical therapy." Ms. Hager's counsel also argued that "penalties and sanctions should be imposed due to the untimely authorization for the [repeat] MRI" despite the fact that the WCJ repeatedly said that he had not pled that claim in the 1008 Disputed Claim for Compensation that was filed on November 16, 2018.

Dr. Brunet testified by deposition that he performed surgery on Ms. Hager on November 14, 2017, to repair a torn rotator cuff and also performed a second surgery on March 27, 2018, which was a closed manipulation. Dr. Brunet testified that by April 12, 2018, Ms. Hager "was starting to get her [right shoulder] motion

5

back, and was in physical therapy." Dr. Brunet's last visit with Ms. Hager before she moved to Virginia was on May 17, 2018, at which time he recommended she continue with the plan for physical therapy.

Despite Ms. Hager relocating to Virginia in August 2018, Dr. Brunet testified that he treated her one last time, on October 11, 2018. At that visit, Dr. Brunet testified that Ms. Hager "had lost a lot of strength function in her shoulder, [in] particular the rotator cuff" and that he recommended Ms. Hager have a repeat MRI "to make sure that weakness that she had wasn't representative of progression of breakdown of her cuff." Dr. Hager testified that in his opinion, Ms. Hager had not reached maximum medical improvement ("MMI") and that he would recommend pain management if and when the recommended repeat MRI showed nothing to be done orthopedically.

On cross-examination, Dr. Brunet testified that per his office note from May 17, 2017, he was hopeful that Ms. Hager would be ready for sedentary duty at her next visit, which was scheduled for June 2018. However, because Ms. Hager missed her June and August 2018 appointments, he did not have an opportunity to evaluate her for her return to sedentary duty. Dr. Brunet also clarified that it was his opinion, following Ms. Hager's office visit on October 11, 2018, and the follow up meeting he had with Ms. Breaux, that a clear MRI was necessary before he would release Ms. Hager to work under his specific restrictions.

At trial, Ms. Hager and the following four witnesses testified: Mary Attenhofer; Clarissa Budzinski; Jamie Leblanc; and John Hampton. Ms. Hager testified that since 2014, she has been the primary caregiver for her two granddaughters, Shannon, age nine, and Jasmine, age seven. At the time of her shoulder injury in July 2017, Ms. Hager testified that she was the overnight supervisor for HHS at Cabrini and that her "regular work schedule was 9:30 [p.m.]

6

to 6 a.m., five days a week." In August 2018, Ms. Hager testified that she and her two granddaughters moved to Virginia in order to be closer to her best friend and some of her relatives. However, Ms. Hager testified that after she lost her benefits, she and her granddaughters moved from Virginia to Florida on December 1, 2018, in order to live with her daughter, Clarissa Budzinski.

On cross-examination, Ms. Hager testified that shortly after her second surgery in March 2018, she attended physical therapy sessions until May 23, 2018. Ms. Hager testified that she missed two appointments with Dr. Brunet that were scheduled in June and August of 2018, and that she was not aware that she had been approved for the additional twelve prescribed therapy sessions scheduled for the summer of 2018. Ms. Hager also testified that she did not mention to HHS that she was moving to Virginia and Florida but that she remembered discussing the moves with her counsel's secretary, Mary Attenhofer. When asked what jobs she thought she was capable of doing in February 2019, Ms. Hager testified that she thought she could work a copy machine, fold rags and washcloths, wipe off pagers and cell phones, and could count and log inventory. Ms. Hager also testified that HHS offered her a light-duty position at a hospital in Ocala, Florida with these same specific tasks in February 2019, paying her the same pre-accident wage of $12 an hour but that she did not take it because "Dr. Brunet said that he wouldn't authorize it until I got an MRI[.]"

Mary Attenhofer, a workers' compensation secretary and bookkeeper for Ms. Hager's counsel, testified that Ms. Hager's last payment of benefits was received on October 22, 2018, which covered the week of October 11-17, 2018. Mary testified that she first learned of Ms. Hager's move from Louisiana to Virginia in "July or August of 2018" and that she notified (by phone) HHS of Ms. Hager's move at that time. However, Mary testified on cross-examination that she did not

7

know who she spoke with at HHS regarding Ms. Hager's move to Virginia and that there is no writing or record from her office to HHS advising them of Ms. Hager's new address.

Clarissa Budzinski, Ms. Hager's daughter, testified that her mother and two nieces have been living with her in Florida since December 2018. Clarissa testified that her mother has the primary responsibility of getting her two nieces off to school each day. When asked whether her mother can help around the house, Clarissa testified that she can help with the dishes, dust, fold clothes, and grocery shop. On cross-examination, Clarissa testified that since her mother's move to Florida, she is not aware of her mom seeing any doctors for her shoulder or attending any physical therapy sessions.

Jamie Leblanc, a senior claims specialist with CorVel, testified that he was assigned Ms. Hager's workers' compensation claim arising out of the July 20, 2017 accident. Jamie testified that no 1010 request for physical therapy was filed by Dr. Brunet following Ms. Hager's first surgery on November 14, 2017, but that he did receive a 1010 request for authorization for physical therapy following Ms. Hager's second surgical procedure, which was on March 28, 2018. Jamie testified that the request for physical therapy following Ms. Hager's second surgical procedure was approved on the same day the request was filed. Jamie also testified that there was a form 1010 request for authorization of twelve additional physical therapy sessions filed on May 30, 2018, which was approved on May 31, 2018. Jamie testified that, per standard procedure, this approval form would have been sent to Ms. Hager's counsel. However, on cross-examination, Jamie testified that the approval was only sent to Ms. Hager at her address in Ball, Louisiana, and that he did not learn of Ms. Hager's relocation to Virginia and Florida until her deposition, which was on February 1, 2019.

8

Jamie testified that Ms. Hager did not attend any of the additional twelve approved physical therapy sessions and that Ms. Hager missed her follow-up appointments with Dr. Brunet in June and August 2018. Despite not receiving treatment, Jamie testified that HHS continued to pay Ms. Hager indemnity benefits through October 17, 2018. Jamie testified that the last 1010 request for authorization form filed on behalf of Ms. Hager was on April 8, 2019, a form signed by Dr. Brunet for a repeat MRI, which was approved on that same day.

Jamie testified that it was upon receiving Dr. Brunet's October 11, 2018 clinical notes wherein he stated, "Do not think in my opinion she has reached maximum medical improvement as of yet and can be employed only in a sedentary fashion" that HHS determined Ms. Hager could return to work. Thereafter, Jamie testified that on October 17, 2018, HHS offered Ms. Hager a sedentary-type of light duty job at the same pay and hours as she had prior to her injury. When no response to the job offer was received, Jamie testified that HHS terminated Ms. Hager's TTD benefits. When asked by the WCJ to explain why indemnity benefits were terminated at that time, Jamie testified as follows:

A. As far as standing as an employer of injury, I mean, the - - where she was working when she was injured, that they can make an offer as long as it's within the restrictions set forth by the treating doctor of employment, and if that is not - - there's a no-show, no-call, type of thing that they're able to terminate benefits based off of that.

Q. Did the fact that there was a five-month gap in treatment and the fact that Ms. Hager missed some physical therapy appointments - - did that factor into that decision?

A. Yes, it did. That was an extended amount of time for - - to go without treatment and could be considered almost an abandonment of treatment for some time.

Jamie testified that CorVel took additional steps to confirm what Dr. Brunet said in his October 2018 clinical note by scheduling a "medical rehab conference[,]"

which is when "a medical case manager go[es] [to] meet with the doctor face to face to discuss medical prognosis, [and] return to work prognosis[.]" Jamie testified that on November 18, 2018, Ms. Breaux met with Dr. Brunet to discuss Ms. Hager's case and that Dr. Brunet signed a work release form that explained what Ms. Hager could and could not do. Jamie testified that HHS offered Ms. Hager a second job opportunity on November 21, 2018, a job that included the same position as the first job offer except no lifting over ten pounds.

John Hampton, Environmental Services and Housekeeping Director at Cabrini Hospital, testified that he supervises and manages the housekeeping department and that he would be Ms. Hager's supervisor if she were to return to work at the Cabrini site. John testified that Ms. Hager could perform her light-duty assignment sitting down and that her job would entail making copies, folding rags and mops, creating washcloth origami, logging inventory for paper products, rolling silverware, and wiping off and cleaning empty chemical bottles, pagers, phones, keys, and key fobs, all of which weigh less than five pounds. John testified that none of these tasks involve using Ms. Hager's arms or shoulders.

After the trial on the merits, the WCJ rendered a final judgment that: (1) denied Ms. Hager's claim for TTD benefits; (2) awarded Ms. Hager SEBs from October 18, 2018 through May 16, 2019; (3) ordered HHS to pay $8,000.00 in penalties for its arbitrary and capricious termination of indemnity benefits; and (4) ordered HHS to pay $13,000.00 in attorney fees plus court costs. The WCJ also provided lengthy oral reasons for its judgment, some of which are stated as follows:

> Now, turning back to Ms. Hager's claim for temporary total disability benefits, she's only entitled to that if she can show by clear and convincing evidence that she's incapable of doing any type of work at all. Of course, if she's capable of doing some type of work,

10

sedentary or light, she's not entitled to temporary total disability benefits.

As I was stating, Dr. Brunet consistently said since October 18th - - first he says on the work status document where it says, "No work", he doesn't check "No work." He says she's capable of working with restricted duties, restricted activities, and this is sedentary.

So she's not entitled to temporary total disability benefits, but what she's entitled to is SEB benefits. And because there's not an objectively defined position and because the employer, although they had a different address for Ms. Hager than her initial employment address had by [HHS] and they never properly informed Ms. Hager of that, she's entitled to SEB benefits at a zero earning capacity, but this only runs through the date of the trial. And the reason this only runs through the date of the trial is because [on] the day of the trial[,] Ms. Hager candidly admitted to the Court on two different occasions that she can do light-duty work. She knows she needs [an] MRI, but she admitted she can do light-duty work, and she even said she can actually do the job, which was all of these folding things and origami things, mop folding, [and] rolling silverware. She did have a little bit of a reservation about silverware, but she said she could do it. Now, that job was the same hours as she was working for [HHS] at her hospital in Alexandria, and she even asked them in March of 2019 - - she even told them in March of 2019, "Hey, I'm willing to attempt this job, but I need you to shift my hours to the nighttime hours," and they said they would. Even after they said they would and made her that job offer, she didn't return to work. So since she's capable of earning 90 percent of her - - in fact, her same wages, it terminates from the date of the trial, the date she'd admitted she can do that job.

. . . .

That will refer me back to something I should have previously said was when they offered Ms. Hager this job, whether it was October of 2018 or November of '18, certainly by [the] November of '18 job offer, they [HHS and CorVel] were well aware that when Ms. Hager saw Dr. Brunet in October she wasn't even living in Louisiana and she was living in Virginia, because he [Dr. Brunet] has that plainly in his medical report. The nurse case manager [Kayla Breaux] followed up and learned it as well there.

. . . .

What type of penalty is Ms. Hager entitled to, if any at all, for the termination of her benefits? Well, clearly I think it's pretty obvious now or ought to be that there was no reasonable basis to terminate Ms. Hager's benefits when they did [on] October 17th of 2018. After all, they didn't give her an objective job. They didn't even send a job offer to her where she was living in Virginia because

they should have known from Dr. Brunet's report she's living in Virginia. They should have also known that she was no longer living at the address where she initially applied for employment with [HHS] because the physical therapy records and the 1010s being received by the adjuster were telling them that's not her address anymore.

Furthermore, it was clearly stated by Dr. Brunet that she's not to do any type of work at all with her right arm. But when they got to offering her a position with specific position responsibilities, every one of those responsibilities involved what? Using her right arm. Even this odd offer that says "Wipe off and clean" followed by "Unacceptable work: cleaning of any sort." How about that? Nobody noticed that, explained that to the Court why that is not unreasonable and arbitrary and capricious.

So Ms. Hager's entitled to an $8,000 penalty. In other words, Ms. Hager's entitled to the reinstatement of benefits on a SEB status, zero earning capacity through the date of the trial, May 16th, 2019; $8,000 penalty, interest on all those past due payments[.] Then I'll assess a $13,000 penalty for - - to Mr. Flournoy for recovering these indemnity benefits and this penalty for Ms. Hager. That's a 1201 (I) penalty, by the way.

Both Ms. Hager and HHS now appeal this final judgment that awarded Ms. Hager SEBs from October 18, 2018 through May 16, 2019, along with penalties and attorney fees.

**STANDARD OF REVIEW:**

Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. *Id.* As the Louisiana Supreme Court stated in *Stobart v. State, Through Department of Transportation & Development*, 617 So.2d 880, 882 (La.1993) (internal citations and quotation marks omitted):

[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the

12

factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that the reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

**Ms. Hager's Appeal:**

On appeal, Ms. Hager alleges the following three assignments of error:

1. The WCJ manifestly erred in terminating SEB forever on May 16, 2019[,] on the basis of a job offer now acceptable and "available", even though he had previously declared that job offer unacceptable and "unavailable" because it had not been approved by a physician.

2. As a matter of law, the WCJ erred in terminating SEB on May 16, 2019 and refusing to follow the statutory dictates for the termination of SEB delineated in 23:1221 (3) (d).

3. Because the facts concerning defendant's failure to authorize necessary medical treatment, i.e., failure to authorize physical therapy after plaintiff's first surgery and failure to timely authorize the MRI, are not in dispute, the WCJ erred in failing to award sanctions due to defendant's arbitrary and unreasonable inaction and defendant should be estopped from defending against sanctions with its silence because no 1010's were submitted.

Pursuant to La.R.S. 23:1221(1)(c), "compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment." Once an employee is able to return to work, SEBs are available if he is unable to earn ninety percent of his pre-accident wages. La.R.S. 23:1221(3)(a)(i). The Louisiana Supreme Court addressed the standards for proving entitlement to SEB payments in *Clay v. Our*

13

*Lady of Lourdes Regional Medical Center, Inc.*, 11-1797, p. 4 (La. 5/8/12), 93 So.3d 536, 538-39, as follows:

> The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. *Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793 (La. 1/9/11), 56 So.3d 170, 174; *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52, 55 (La.1993). La.R.S. 23:1221(3)(a) provides that an employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn 90% or more of his average pre-injury wage. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. *Poissenot*, 56 So.3d at 174; *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La.7/1/97), 696 So.2d 551, 556. Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i); *Poissenot,* 56 So.3d at 174; *Banks,* 696 So.2d at 551.

After reviewing the testimony and medical records, we find no merit in Ms. Hager's first two assignments of error that allege the WCJ erred in terminating her SEBs on May 16, 2019. Despite Dr. Brunet's records from October 11, 2018, stating that Ms. Hager is capable of performing sedentary work, the WCJ found that the first job offer from HHS on October 17, 2018, was unacceptable because it did not "tell her anything about what she is expected to do, [and] when she's to come back to work [and] it's sent to the wrong address[.]" Further, the WCJ found that HHS's second job offer on November 21, 2018, was also unacceptable because the specific job position responsibilities indicated that Ms. Hager would be working with her right arm despite the fact that Dr. Brunet's medical notes had restricted her from doing any work with her right arm. Thus, the WCJ found that Ms. Hager was entitled to receive some type of benefit during the months between HHS's decision to terminate her TTDs and the point in time wherein Ms. Hager could accept HHS's sedentary job offer, which he determined was at trial on May

14

16, 2019. The WCJ found that despite Ms. Hager knowing that she needed an MRI before Dr. Brunet would classify her as MMI, she testified that she could do light-duty work, including all of responsibilities listed in HHS's job offers. Ms. Hager testified at trial that she would accept HHS's job position at her same pre-accident wage and hours. Based on the medical evidence submitted, along with Ms. Hager's testimony that she could perform the job responsibilities offered, we find no error in the WCJ's factual determination to limit the award of SEBs from October 18, 2018 through May 16, 2019, based on a zero earnings capacity.

We also find no merit to Ms. Hager's argument that the WCJ erred in refusing to award sanctions due to HHS's failure to authorize necessary medical treatment, namely the physical therapy following her first surgery and a repeat MRI. It is clear from reviewing the record that the WCJ repeatedly denied Ms. Hager's attempt to amend her 1008 form with claims for penalties and attorney fees due to HHS's alleged failure to authorize medical treatment and that he did not consider these claims at trial, as evidenced by the judgment. Further, Ms. Hager's counsel told the WCJ specifically at trial that "the only issue, really, of penalties and attorney's fees, concerns the termination of benefits." The record also evidences the fact that HHS objected to all arguments made or evidence admitted on the issue of its failure to authorize medical treatment, arguing that Ms. Hager's attempt to expand her claims to include a request for penalties and attorney fees for its alleged failure to authorize medical treatment had been denied.

Nonetheless, even if we were to consider the merit of these claims, we agree with HHS that penalties and attorney fees cannot be recovered under these facts as there is no evidence that Dr. Brunet or any other provider submitted a formal request for authorization of treatment. La.Admin. Code Tit. 40, pt. I, §2715 requires that a health care provider file a LWC Form 1010 requesting authorization

15

from the workers' compensation carrier to provide medical services to the claimant. Although Ms. Hager argues that the claims adjuster should have prepared and forwarded the 1010 form for Dr. Brunet to fill out, we find no authority to support this argument. In fact, this court previously stated in *Hayes v. Louisiana Risk Management*, 93-1144, p. 4 (La.App. 3 Cir. 4/6/94), 635 So.2d 591, 593, *writ denied*, 94-1020 (La.6/17/94), 638 So.2d 1097, that there is "no authority in the jurisprudence imposing an affirmative duty on the insurance carrier to contact a doctor to schedule medical procedures." Likewise, we find no authority to impose this duty of generating a 1010 request for medical treatment on the claims adjuster.

**HHS's Answer to Appeal:**

In its answer to appeal, HHS contends that the WCJ erred in assessing penalties and attorney fees for its decision to terminate Ms. Hager's TTD benefits in October 2018. Specifically, HHS argues that it was not arbitrary and capricious in terminating benefits because it relied upon Dr. Brunet's October 11, 2018 office note that confirmed Ms. Hager was capable of returning to sedentary work, which it could accommodate at her full wage. HHS argues that it paid indemnity benefits through October 17, 2018, despite the fact that Ms. Hager missed twelve sessions of physical therapy and skipped two follow up appointments with Dr. Brunet throughout the summer of 2018.

"Whether or not the employer is cast with attorney fees and penalties is a question of fact that will not be reversed on appeal absent manifest error." *Lambert v. Brookshire Grocery Co.*, 06-1001, p. 11 (La.App. 3 Cir. 12/20/06), 945 So.2d 918, 927. In this case, the WCJ imposed sanctions due to HHS's termination of indemnity benefits on October 17, 2018, on the basis of unacceptable job offers and because HHS continued to send correspondence to Ms.

16

Hager at an old address despite having information from Dr. Brunet and his medical records that she had moved to Virginia. It is also worth noting that Dr. Brunet repeatedly testified that he would not clear Ms. Hager to work within the restrictions he set in October and November 2018 until a repeat MRI showed that she had reached MMI. After a thorough review of the record and considering the credibility findings by the WCJ, we find no manifest error in the WCJ awarding an $8,000.00 penalty for HHS's termination of indemnity benefits and $13,000.00 in attorney fees.

**Ms. Hager's Supervisory Writ Application:**

Following the May 16, 2019 trial, Ms. Hager returned to light-duty work with HHS. On January 16, 2020, HHS filed a Motion to Compel Functional Capacity Examination, which the WCJ granted. The January 27, 2020 judgment ordered Ms. Hager to attend the FCE on February 12, 2020, at Strive! Health & Rehabilitation, in Ocala, Florida, where she was residing. Ms. Hager now seeks review of this interlocutory ruling, alleging the following sole assignment of error:

> Did the WCJ abuse his discretion by finding it medically reasonable to order plaintiff to undergo the rigors of a FCE test, even though defendant's treating orthopedist said the testing was not necessary and if done, would not change the permanent work restrictions/work limitations he had previously set in September 2019?

In response, HHS argues that it requested, for the first time, Ms. Hager to attend a FCE "to determine her current vocational capacity to see if the scope of her daily assignments could be expanded to meet a need at the current hospital where she is employed." HHS argues that the WCJ properly ordered Ms. Hager to attend an FCE in her hometown of Ocala, Florida, since Ms. Hager had not sought medical treatment since October 2018.

It is undisputed that Ms. Hager reached MMI by September 2019, and that she has returned to the workforce and continues to work in the same job that was

17

created by HHS to fit within the permanent work restrictions as set by Dr. Brunet. As stated in correspondence between Dr. Brunet and Ms. Hager's counsel dated September 13, 2019:

> From an orthopedic standpoint, [Ms. Hager] has reached MMI and you [Dr. Brunet] have nothing further to offer her in the way of orthopedic treatment. You think that she is capable of employment but only at the sedentary level. This restriction of work activity to sedentary is permanent. Likewise, the specific work restrictions you had previously set in a conference with Ms. Hager's case manager on November 15, 2018 remain in effect and should be considered permanent work restrictions.

Further, when Dr. Brunet was asked on January 15, 2020, whether he thought it was medically reasonable or necessary to order Ms. Hager to undergo an FCE, he specifically responded with "no" and commented that the FCE was "not necessary nor will it change [his] assessment."

Because Ms. Hager's orthopedic surgeon was able to issue permanent work restrictions upon her reaching MMI, we find that it was unreasonable and an abuse of discretion for the WCJ to compel Ms. Hager to undergo the rigors of a FCE. *See City of Jennings v. Doucet*, 03-1099 (La.App. 3 Cir. 2/4/04), 865 So.2d 1056 (wherein the WCJ found that an FCE was not necessary because the claimant's treating psychiatrist had already issued work restrictions without the FCE). For these reasons, we hereby grant Ms. Hager's supervisory writ application filed on February 20, 2020, and reverse the WCJ's judgment that compelled Ms. Hager to undergo the FCE.

**DECREE:**

For the above stated reasons, we hereby affirm the WCJ's August 22, 2019 judgment in its entirety. Additionally, we grant Ms. Hager's writ application and reverse the WCJ's January 27, 2020 interlocutory judgment that granted HHS's

18

Motion to Compel Functional Capacity Examination. Each party is to pay their own costs.

**APPEAL AFFIRMED; WRIT GRANTED.**